Q.F. v. Howell Mr. Chalmers. Thank you. May it please the Court. These appeals raise what we believe are important issues concerning, first, the interplay between the Prison Litigation Reform Act and the administrative remedies requirement of the PLRA and the Georgia renewal statute, on the one hand, and, second, the standard by which a supervisor may be held liable for deliberate indifference to the safety of a prisoner under the widespread abuse or widespread violence theory of recovery. The District Court determined that, except for three defendants in the case, a counselor, Deborah Hambrick, a JCO or juvenile correctional officer, Christopher Durham, and a sergeant, except for those three, no defendant was placed on notice of threats to Q.F. by Reginald Patton and his gang. If this case were to proceed at all, it would be limited to that failure to protect claim against the defendants who were on actual notice of a threat to Q.F. But we think there's a more fundamental problem with the case, and that's the issue and that's the problem that the PLRA exhaustion requirement was not met before the case was brought in the first instance. The Georgia courts disagree with your position. That's true, Your Honor. Why shouldn't — if it's a Georgia statute that we're borrowing, although it's understandably a Federal question, but it's a Georgia law that we're borrowing with regard to the refiling of the complaint, why should we create a split with the Georgia courts, given that 1983 actions can also be brought in State court? Why should we do that? We should do it — I'm suggesting the court should do it because there are two steps to the analysis that have to occur in this case. In cases such as this, the Eleventh Amendment will apply the statute of limitations and the State's tolling rules that apply for the case. We know that's Georgia's two-year limitations period and the renewal statute. Once that analysis is complete, the court moves to Federal law to determine whether or not — to decide the issue that is before it. So that's why I believe the Baskin case is not controlling. I'll get to in a moment why I believe it's not. I'm not saying it's controlling. I know it's not controlling. We have the power to go a different way. That's not my question to you. My question to you is, why should we do that, given that we're borrowing those State laws in this 1983 action and the Georgia courts have interpreted them in a certain way in this particular context? The Georgia Court of Appeals has interpreted the PLRA against the position I'm arguing in this case, but it did so contrary to an important principle that has been set down by the Georgia Supreme Court and that's been applied time and again. This Court said in a case that was entered after the briefing was complete in this case, Hancock v. Cape, that a lower court opinion, although this is a quote from Hancock v. Cape, 875F3rd 1079, although we give lower State court opinions proper regard when considering a question of State law interpretation, the State's highest court is the best authority on that law. Baskin did not do a critical intermediate step in the exhaustion analysis, and that is to recognize what Granite State, the Georgia Supreme Court decision held, and that is that a renewed action stands on the same footing as to limitation as the original case. If that is so, if that is so, then we don't simply say that the statute of limitations is no longer in the case simply because it is. We ask, why is a renewed action on the same footing as the original action? Georgia's renewal statute. Well, if you're looking at this from a pure administration perspective, why would you want the PLRA to apply to someone who is no longer in prison? Well, Your Honor, this Court in Harris addressed the policy questions behind the PLRA and when the determination is to be made when that statute applies to a prisoner confined. There's no policy question before this Court. I'm asking you why it makes sense to apply the PLRA to a person who is no longer in prison. Because the critical question is, when was the person confined? The person in this case, QF, was confined at the time that he commenced his action. The time he commenced his first action, not second. I want to ask you a different question. Yes, sir. You've got the policy and it's in the record, and you have a certain amount of time to file the formal grievance. You can deal with it informally. And I think the law is, if you make an untimely complaint or grievance and the State, the prison authorities respond to it on the merits without saying it's untimely, then the prison or the State has waived the untimely defense, the procedural defense. That's true, isn't it? That would be correct, Your Honor. And if you win your grievance, you don't have to appeal. No point in appealing. If you file a grievance and you win, then you're done. True? I'm not sure that that is true, Your Honor, generally speaking. There's an Eleventh Circuit case that says it's true unless the State regs require you to appeal anyway. Okay. Policy. And I read the policy here. It doesn't say you have to appeal anyway. So here's my question. They made the informal complaint. They said, I need to be transferred. I'm in danger. You transferred him. He's won. He's exhausted. No. What's the problem now? There is a critical problem with that, Your Honor. The exhaustion requirement is absolute. The courses, the cases say that every step in the exhaustion available remedy must be utilized. Absolutely. But, I mean, I think there's binding circuit authority that says you waive untimeliness, so you can't claim this is untimely because they addressed it on the merits. They transferred him. That's what he asked for. So now he's won. So I'm not saying that he doesn't have to exhaust fully. He does have to exhaust fully. My proposition is he did. He fully exhausted because he made the complaint and he got transferred. No, sir. End of problem. No, sir. I would disagree with you, and here's the reason why. The exhaustion defense, the evidence that we presented on exhaustion, first of all, was not disputed in the district court. The decision by the district court that there was no exhaustion is not on appeal currently. But the reason why you must exhaust all steps in a policy is because we have a complaint that says this is a dangerous facility. If an administrative remedy had been pursued, the DJJ could have addressed that issue. Transferring the fact that some relief may have been given does not answer the question of whether or not all of the remedies must be exhausted under the policy. Do you want to spend all your time on the — I do not. — on this appeal? I do not, but I do want to tell the Court what I — give you an example of why I think commencement is critical and why Baskin should not control here. Take a case that's filed in State court. It's pending for more than a year, and then it is dismissed voluntarily and then refiled. The defendant then removes the case to Federal court. This is on diversity jurisdiction. The problem with the case, you can't remove a case based on diversity jurisdiction more than one year after it has been commenced. This is the Hathaway case. This is the Hathaway case. Isn't this a Federal question? This is not a diversity case. No, no, no. This is the Hathaway case decided by Judge Fitzpatrick in the Middle District. And the judge found that in order to determine whether or not the case could be looked at when that renewed action was commenced, he did so by going to Granite State, which says that a renewed action stands on the same footing as the limitation as to the original action. And if that is so, then the original action governs the time of commencement. Hathaway is the case. But that's the limitations period, not as to whether or not you have to exhaust Federal remedies, which is a Federal question. The limitations question can't be separated because the key issue is when is that action commenced. And that cannot be separated from Harris. We know that because the Baskin court looked to Harris to try to resolve this question. It did so incorrectly, however, because it didn't correctly apply Granite State. You're almost out of time on the merits, but let me ask you this question. You really think that this complaint is short on details? I do, Your Honor. I believe the complaint is short on details as to supervisors for this reason. The courts have said that in order to make out a claim — No, no, how is it short on the supervisors? It's short on supervisors. They had knowledge that this was a bad place. I think that's as far — I mean, for a long time they had knowledge. I think that's as far as we can go with the allegations. And I think the problem is that's all that we can say about — There's lots of notice in this case in the complaint. Well, but the notice has to be actual notice of the harm that befell QF. And so let me just try to address — Of the specific harm? No. It has to be actual notice of the risk that likely could fall on him. There were riots every what? I forget whether it was every week or every month, but there were — that's the allegation of the complaint. The allegation — You said almost daily. The allegation — That doesn't put you — The allegations are not that the riots were almost daily. There are identified riots occurring. The allegation is that there were assaults occurring almost daily. So if you look to what — And QF had been raped twice. QF was assaulted twice before the incidents in May and June of 2011. There's no indication that any — that that information was reported to any supervisor. So let me — if you look to what you must say — I know, but you're not talking about — I speak only for myself, but you're not talking about a prison where nothing has been going on and a prisoner, a detainee gets assaulted. You're talking about an institution that has a very sordid history of serious problems, of decreasing the ratio of corrections officers to individuals, of almost daily blowups and You think that doesn't put the director of that facility on notice that assaults are likely to happen? I see I'm out of time. If I could, I'd like to respond. You can answer the question now. Your Honor, to constitute widespread abuse, this Court has said again and again that the abuse that must be alleged and then proved has to be obvious, flagrant, rampant, and of continued duration. When you have allegations against supervisors in a complaint that assaults were occurring daily or almost daily, as we have here, those do no more than state what the elements of the claim are, in the same way that in Twombly there were allegations in a well-pled complaint that there was a contract to restrain trade. We can say that that's not a nonsensical allegation. You actually have to prove that there was a contract to restrain trade in order to prevail on an antitrust claim. But simply saying that without fleshing it out with facts is not sufficient. In the same way in Ashcroft v. Iqbal, when you say that a policy, a person with authority to set policy actually established a policy to put someone behind bars in extremely harsh conditions, you have essentially said what you need to say, what you will need to prove down the road. But what did Iqbal say? They said that's not sufficient. You actually have facts, need to have facts behind that to show what the claim is all about. And that's what's missing here. Throughout all the allegations of widespread abuse over a period of time, based on the MOU, based on riots, based on audits, we don't have one bit of information that another youth was attacked by. Counsel, if this were a class action for injunctive relief, a district judge would shut it down just because everybody in the institution is subject to the behavior. But it happens to be a personal injury claim under 1983 instead of a suit for injunctive relief. But I've never seen a situation as bad as this in terms of allegations. And not only that, just fact. I know I'm out of my time. I'm just giving you my two cents' worth. I understand. Okay. And we understand your case. Thank you. Mr. Moore. Yes, Your Honors. Leighton Moore for the plaintiff. On the exhaustion issue, let me start with some basic facts. When this case was filed on January 26th of 2015, and QF was not in custody anywhere, and that's undisputed. So when this case was filed, he was not a prisoner and not subject to any exhaustion requirement under the PLRA. The question then becomes, what authority can defendants provide for the contention that this Court should pretend that this case was filed on a date other than the date it was actually filed? There's no Federal authority for that. Harris v. Garner says that under the PLRA, the prisoner status has to be determined as of the date the action is commenced. And an action is commenced under the Federal Rules of Civil Procedure under Rule 3 when the complaint is filed with the Court. The complaint in this case was filed with the Court January 26th of 2015. It's got a 2015 district court case number. It's not a 2014 case. Under plaintiffs, under the defendant's argument, even though a plaintiff filed two complaints, one in 2014, which was voluntarily dismissed, and then another in 2015, he only commenced one action. That's flatly contrary to Rule 3. That's not how the Federal Rules of Civil Procedure work. Defendants also can't rely on State authority. They can't rely on the Georgia renewal statute really for anything. All that statute does is it tolls the statute of limitations. And we filed a 28-J letter yesterday. I don't know if the Court has had time to receive and digest that authority. I do have copies of that case if you'd like me to provide them to the clerk. And I've got one for opposing counsel. The Lilliston case really doesn't change the law at all. It just summarizes and collects the well-established body of Georgia case law to the effect that under the Georgia renewal statute, the renewal action is not a continuance of the previous action. And so it doesn't stand on the same footing for purposes of the statute of limitations as the previous action. That's the whole point of the renewal statute is to provide an extra six-month grace period after a voluntary dismissal within which the statute of limitations does not run. And within that six-month period, the plaintiff can file an action that is considered to be a de novo action. And that's a two-edged sword because if a defendant, for example, has waived a defense in the first action, that defense is now renewed along with the rest of the case. The plaintiff, as the Supreme Court said in a more recent case, starts over from scratch. And so the — and that's why the Georgia Court of Appeals in the Baskin case rejected defendants' exact argument. In addition, it's worth mentioning that when the 2014 action was filed, D.J. Jay's administrative remedies were not available to plaintiffs because he was no longer a juvenile. He was no longer subject to that agency's jurisdiction at all. He was locked up on adult charges in the Gordon County Jail up in North Georgia. And there's no juvenile aspect to that case. So there's no — the fact that he had been released from D.J. Jay and then later, in a totally independent event, got locked up on adult charges at the time the 2014 case was filed, doesn't make it feasible that he could file a D.J. Jay administrative grievance. That's not available to him at that point, and the PLRA only requires — But it's not at the point of filing that you determine whether or not a grievance was available. It's at the time that the state system requires a grievance to be filed. Then you determine availability. If the state system says within 30 days of an incident or event, you have to file your first-level grievance, that's the moment in time that you assess availability. Not if you blow that time period and two years later you say, oh, I'm no longer at that institution. I don't have to exhaust now. Right? Well, if you're released from the custody of that agency, several circuit courts have held, no, those remedies are not available to you anymore. If you're released later, even though they were available to you while you were in? That's right. We've cited a Second Circuit case in our briefing where a plaintiff was released from, I believe, state custody and then later locked up in a Federal prison. And what the — I mean, this is based on the language of the PLRA. It says as are available, such remedies as are available. Well, yeah. That present tense verb refers to the time of the filing. But I think Judge Jordan's point is you can't miss the time limit, you can't miss the opportunity, and then claim, having defaulted your right to file a grievance, that the remedy is no longer available. Not if you're still locked up in the same jail. That's clearly true. You can't do that. Or locked up in another jail or whatever. I mean, I read this policy. I don't remember what it said, 21 days or 30, what the time limit was. But if you miss that time limit, the remedy does not then become unavailable so that you don't have to exhaust. You do have to exhaust, and it means proper exhaustion. And so you do have to comply with the time limit unless you file an untimely grievance and they address it on the merits. That's right, isn't it? It sounds like I've got two votes out of three against me on that point, and maybe three. So I'm going to move on to my next point, if you don't mind. Which brings me to your point, Judge Hinkle, which is that QF exhausted his remedies. He informally grieved on a constant basis. He was very vocal about the threats he was receiving and the fact that he didn't feel safe in the facility. And that people were constantly trying him, trying to draw him into fights, that he was being assaulted. He reported numerous incidents. And finally, his lawyer, when he finally got a lawyer, wrote a letter to the DJJ and submitted a written grievance, which DJJ accepted and acted on, and they transferred QF out of the facility. They transferred him to another facility, which was also not very good, but it wasn't Eastman. And so his remedy was granted by DJJ. And so for them to claim now that he didn't exhaust his remedies, his administrative grievance process, while he was in DJJ, I think is incorrect. I'd like to move on. I wanted to ask you a question about the merits. Yes, Your Honor. I think you were turning to it. The judge gave you a deadline to amend Count 3. You got it extended to, I think, May 1, 2017, and maybe you amended it and didn't make it into the record on appeal. I don't think so. I think I went back to the original docket. You haven't amended yet. We have not because defendants filed a notice of appeal before that deadline, is my recollection. Oh, that's why you didn't amend. Yes, Your Honor. I thought that the district court was divested of jurisdiction by the notice of appeal. We're up on the whole motion to dismiss. Probably not. You could probably file an amendment. But in any event, you intend to do it when you decide. Yes, Your Honor. Yes, Your Honor. We'll go back to Judge Story and ask for that relief if it's not a matter of right. But he'll either grant it or he won't. The appeal was taken within that time frame. That's my recollection, Your Honor. Yes. I think that's right. I think you had the notice of appeal in, but I just want to make sure I had it right. You haven't filed an amendment to Count 3 yet. Not yet. No, Your Honor. I'd like to turn to the question of knowledge on the part of the supervisory defendants. So these defendants are the DJJ commissioner, and we sued a former one, one who was in place from May 2010 to January 2011, and then Amy Howell, who was in place from January 2011 through November of 2011. Neither of them lasted a full year. Right. The district court dismissed claims against some other supervisors who had left before your client's assault, right? That's correct. Saying that the time period was too long, rendering the causal connection too speculative. Too tenuous. Right. Yes, Your Honor. That's correct. So the ones that were up on here were the ones who were in office. At the time. Holding their positions at the time of the event. Correct. Absolutely right, Your Honor. And Amy Howell, who is the commissioner who was in place during the relevant time, she was there from January of 2011 through November of 2011, and she had a long-running history with DJJ. She was actually the lawyer who, on behalf of the state, helped negotiate the release from federal supervision. And so she's got a long history of knowledge of the memorandum of understanding with the U.S. Department of Justice and how the agency operates, and this was sort of, I assume, some kind of reward, kind of a... I beg your pardon, Your Honor? All the riots that occurred in 2010, she must have been aware of those also. One would think, Your Honor, and when she took, at a minimum, when she took control of DJJ in January of 2011, there is evidence from which a jury could conclude that she knew how bad Eastman was because one of the first things she did was change the director at Eastman. It's the largest facility in the state, and it was rife with violence and problems, and it was grievously understaffed. And so from January of 2011 through, I want to say, June of 2011, maybe July of 2011, I think there were six riots, and there was one in 2010 at least, when the local law enforcement, the guards at the facility, were not sufficient to restore order. They couldn't get the facility back under control from the youth, and so they had to call in local law enforcement to come and help them do that. So the facility was that bad. It's not credible that the director of DJJ who's coming in to take charge of this system doesn't know that the largest facility in the state is that bad. And to further support that allegation, there are audits that DJJ does, and this is alleged in the complaint. There are audits that were done in, I believe, August of 2010 and November of 2011, so they're kind of bookends for the period at issue in our litigation. And both of those audits found severe security problems at Eastman, including, as we've alleged in count two of the complaint, failure to classify and segregate inmates properly. And so this young man, Reginald Patton, who committed it. What was the population? It doesn't show in the complaint. No, Your Honor, it doesn't. It doesn't show what the inmate population was in the complaint. Is there anything in the record that tells us that? No, Your Honor, I don't believe there is at this stage of the case. And I don't recall off the top of my head what the population was at that period. But it's a large facility. It's the biggest one in Georgia. And among the most violent. So the question then in this case, and we're not, defendants accuse us of trying to change the Iqbal and Twombly standard. We're not trying to change that standard. We're happy with that standard. The question is how to apply that standard to allegations of deliberate indifference to institutional security deficiencies under Farmer v. Brennan. That's really the issue. And the defendants argue that we need particularized fact allegations to support our allegations of subjective knowledge on the part of these supervisory defendants who were either working every day at that facility, going to work every day at that facility, or were directly over that facility, the director of secure campuses and the commissioner of DJJ. That argument that defendants are making is just flatly contrary to Farmer v. Brennan. What Farmer says about how you prove knowledge is this. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. So the fact that these officials needed this information in order to do their jobs at a minimum level of competence isn't just a basis for inferring constructive knowledge. It's a basis for inferring that they actually got the information because that's what their jobs required them to do. And that's why the audits were done. That's why the information was collected by DJJ in the first place and made available to DJJ officials so that they could run this facility safely. And so I think a jury could infer, and the district court also inferred, that these officials collected and had the information, the most basic information that they needed to do their jobs and protect these children from getting killed in this facility or sexually abused. I think that's a fair inference on the part of the DJJ commissioner, especially given her personal history with the issues and with the memorandum of understanding. I think it's also certainly a reasonable inference with respect to all of the Eastman supervisors who had to go to work at that facility every day. They couldn't possibly know that. I mean, they couldn't possibly be ignorant of the fact that the whole facility was getting shut down for riots once a month. And so I believe, as Judge Jordan stated, the risk that plaintiffs have to allege that they knew about is the risk that there's inadequate security at this facility and there are constant violent incidents happening, that their guards and their staffing are not sufficient to prevent these incidents from happening. The reason I asked you about the population, that it's not in there, is because the greater the population, this is historically true across the country, the greater the population, the more it exceeds its designed capacity, the more the inmates take control of the management and the management is no longer in charge. And then what happens is the bully, like Patton, becomes the warden. Right. But that's implicit in the allegations of the complaint that the inmates were running things because of the number of riots they were having and having to call in outside people. That's right. And we've also alleged in the complaint that at the end of Amy Howell's tenure as director, an official DJJ press release stated that the agency as a whole was in crisis mode due to safety and security deficiencies. I think during her tenure she knew that. All right. Thank you, Your Honors. Mr. Chalmers. Thank you. A few points on the exhaustion question, Your Honors. My colleague has indicated that what I'm suggesting the court need to do is to pretend that there's a new filing or an old filing date, to go back to some older filing date, that that is actually not the appropriate filing date for this case, and that there is no Federal authority or no authority on point for that. That's the Hathaway case I cited in my opening argument. It's 998 F sub 1479. It's the only case before this Court, the only case in the briefing where a judge actually did the missing step that was missing in Baskin, and that is to decide in a renewed case when is it commenced. It's important. It's critical in a removal case based on diversity because commencement is a part of the analysis. It's absolutely critical in a PLR case, whether it's a limitation of damage or an exhaustion argument, because commencement is a linchpin of the analysis. We know from Baskin that the Georgia Court of Appeals had to go to Federal law to figure out if the claim was barred. The first step that it didn't do under Granite State is to say a renewal action stands on the same footing as to limitation. That means it commences when the original action is filed. That's how the renewal statute works. You don't get the benefit of tolling unless you first put that flagpole in the sand and say my action is commenced. Then you get the benefit of a tolling. Assuming you're right about all of that, what in Georgia law or Georgia prison policies requires an inmate who is successful on his individual grievance to continue appealing to achieve system-wide structural success? It's not Georgia law, Your Honor. Once you determine under the tolling statute. No, no, I'm not talking about tolling. I'm talking about Judge Hinkle's question of whether or not he exhausted that's Ross v. Blake. The U.S. Supreme Court has said we don't make up excuses, we don't make up reasons why a party He got his transfer and that's put him out of the harm. Well Just a minute. Yes, sir. So tell us what the grievance proceeding would be like. Is he going to be like an ombudsman and he wants adjunctive relief against the way it's I'm serious, the way it's operating? No, that's a good question. Or a declaratory judgment out of the institution on whether or not when he was in there. This is Implicit in the transfer is that he had been in danger. He was making allegations of danger, et cetera, et cetera. Maybe not the specific ones here. That was the basis for the transfer, wasn't it? It is pled that he was transferred after making informal allegations. No, no. Yes, sir. He was transferred because of the situation. That is a fair implication from the allegations of the complaint. Okay. So the question I have is why make the person now out of there become effectively an ombudsman? I mean, he's now going back to the institution, to the administration, and basically litigate all the things that happened that gave rise to the transfer. And respectfully, I say that Ross v. Blake controls this question. Remember what this case is about. It's about allegations that not just Eastman, but all of the facilities in DJJ were out of control. He was moved to another facility in DJJ. Ross says that even a full-blown investigation, even a full-blown separate investigation, which presumably would provide that individual claimant some relief for his case, is not grounds for failing to exhaust administrative remedies. But the question is whether getting full relief ends the requirement to exhaust. He got full relief. No. The assumption is that he got full relief. I respectfully disagree with that assumption, Your Honor. He was in the same facilities that he says were dangerous. He was under the same control. What other relief did he—could he get? Could he get with regard to that? It's Eastman. What other relief he could get if the allegations— Regarding Eastman. Well, no, the allegations are that all of the facilities were dangerous and that youth were generally at risk within DJJ's facilities. So you wanted him to then file a second-level administrative appeal asking the Georgia Correctional Authorities to rejig and redo and reconstitute all of those facilities. And that would have been exhaustion in your mind. If you say in your second-level appeal, I know you've given me what I wanted. You've transferred me out of Eastman where I've been harmed. But I think you guys need to go a little bit further. What you need to do is completely bring this whole system down, build it back up again, put in more prison guards, lower the number of inmates at every institution. That's what you expect him to do and say he has to do? Without a lawyer, even. It's just a pro se litigant. That's what he has to do to exhaust? The authorities require that an exhaustion be done, and it is required of pro se litigants. He has to put that issue out there. He has to use every step in the process. He doesn't have to litigate it like a lawyer. He has to seek structural injunctive relief from the Georgia system as if the Georgia authorities were a Federal district court operating on a consent decree. If I could move on to make one final point regarding the merits of the case. Very shortly. Very shortly. Your Honor, this case is not like Purcell. It's not like Hale. It's not like Marsh. It's not like the Lane case. When we're talking about systemic problems that obviously put supervisors on notice of a risk to — of youth-on-youth assault, look to those cases. This case is not like that. We'll start at your sides. The other is, if I could very briefly, Mr. Moore only identified Amy Howell as a responsible supervisor. There's no other discussion of the others because there's no pleading that any of them had a role or responsibility or authority where they could take action with respect to this. We're talking about a principal and others, institutional program directors. The red light is on. Thank you, Your Honor. I think your argument is over. Gentlemen, thank you for arguing this case. The court will be — stand adjourned under the usual order. Good night.